PRESENT: All the Justices

ROBIN MCKENNEL LOVITT

v.  Record No. 012663   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    September 12, 2003
WARDEN, SUSSEX I STATE PRISON

            UPON A PETITION FOR A WRIT OF HABEAS CORPUS

     The petitioner, Robin M. Lovitt, was convicted by a jury of

the capital murder of Clayton Dicks in the commission of

robbery, in violation of Code § 18.2-31, and of robbery, in

violation of Code § 18.2-58.  The circuit court sentenced Lovitt

in accordance with the jury verdict to death for capital murder

and to life imprisonment for robbery.  We affirmed the circuit

court's judgment in Lovitt v. Commonwealth, 260 Va. 497, 520,

537 S.E.2d 866, 881 (2000), cert. denied, 534 U.S. 815 (2001).

     Under Code § 8.01-654, Lovitt filed a petition for a writ

of habeas corpus against the warden of the Sussex I State Prison

(the warden).  Lovitt alleged, among other things, that the

destruction of certain trial exhibits after his convictions were

affirmed by this Court violated his right of due process by

preventing adequate review of his habeas corpus petition.  He

also alleged that the prosecution suppressed exculpatory

evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963),

and that he was denied effective assistance of counsel at trial.

We entered an order directing that the Circuit Court of

Arlington County (the circuit court) conduct an evidentiary

hearing under Code § 8.01-654(C) concerning all issues raised in Lovitt's habeas corpus petition. The circuit court conducted an evidentiary hearing (habeas hearing) pursuant to our order and submitted a written report stating its findings of fact and recommended conclusions of law.[1] See Code § 8.01-654(C)(3).

I. FACTS

In Lovitt, we stated in detail the facts relating to the convictions and penalties imposed on Lovitt for the capital murder and robbery charges. 260 Va. at 502-08, 537 S.E.2d at 870-73, 879. We will recite those facts from our previous opinion that are relevant to the present habeas corpus proceedings:

> [I]n the early morning hours of November 18, 1998, Clayton Dicks was stabbed six times in the chest and back while working during the overnight shift at Champion Billiards Hall (the pool hall) in Arlington County.
>
> A few months before the killing, Lovitt worked as a cook at the pool hall on an evening shift that ended when Dicks arrived to begin the overnight shift. Amy Hudon, the manager at the pool hall, testified that about two months before Dicks was killed, she had trouble opening a cash register drawer near a pool table and asked Lovitt to help her open the drawer. Lovitt opened it by "wedging" a pair of scissors into the drawer's latch. About two months before the killing, Lovitt quit working at the pool hall.
>
> . . . .

---

[1] The Honorable F. Bruce Bach conducted the evidentiary hearing and submitted the required report to this Court.

[On November 18, 1998,] Dicks arrived at the pool hall between 1:30 and 2:00 a.m. The other employees present when Dicks arrived had left the pool hall by 3:00 a.m., leaving Dicks as the sole employee on the premises. . . .

About 3:25 a.m., José N. Alvarado and Carlos Clavell entered the pool hall and saw two men arguing behind the bar. Alvarado testified that one man was shorter than the other, and that the shorter man repeatedly shoved the taller man, who was wearing an apron. Alvarado stated that he and Clavell watched as the shorter man stabbed the taller man six or seven times with a silver-colored weapon. Alvarado saw blood on the taller man's apron and watched as the taller man fell to the floor behind the bar. Clavell testified that he heard the taller man begging the shorter man to stop attacking him. Both Alvarado and Clavell saw the assailant repeatedly kick the man who had fallen to the floor.

Alvarado and Clavell immediately ran from the pool hall to a service station, where Alvarado telephoned the "911" emergency response number and reported what they had seen. Although Alvarado could not identify Lovitt as Dicks's assailant at the preliminary hearing held in this case, Alvarado testified at trial that he was about "80% certain" that Lovitt was the assailant.

When police and emergency medical personnel arrived at the pool hall in response to Alvarado's telephone call, they found Dicks lying on the floor behind the bar in a pool of blood. Dicks was alive but was unable to speak and was taken by helicopter to a nearby hospital. The multiple stab wounds prevented his heart from functioning, and he died while awaiting surgery.

Dicks had been stabbed six times, five times in the chest and once in the back. Four of these wounds were lethal. Dicks also suffered two areas of internal hemorrhage on both sides of his head, as well as external abrasions on both shoulders and on his left knee.

3

The police recovered from the pool hall a cash register that was lying on the floor near where Dicks was found. The register was broken into pieces, the cash drawer had been removed from the register and was missing, and a torn piece of a ten-dollar bill was found nearby. A pair of scissors with orange handles that was usually kept in a container on the bar was missing. A police canine unit found an orange-handled pair of scissors bearing blood lying open in the woods about 15 yards behind the pool hall.

Warren A. Grant, Lovitt's cousin, testified that Lovitt arrived at Grant's home in the early morning hours of November 18, 1998. Grant lived about a quarter of a mile from the pool hall in a residential area located on the "other side" of the woods. Grant stated that Lovitt knocked on his door sometime between 1:30 and 3:00 a.m. Lovitt . . . entered the house carrying what looked like a large, square, gray metal box. After Lovitt unsuccessfully tried to open the locked box, Grant eventually opened it by using a screwdriver to "pop" some of the screws securing the box. Lovitt removed money from the opened cash register drawer and divided the cash between himself and Grant. Lovitt left the cash register drawer with Grant and instructed him to "[g]et rid of [it]." A few days later, Grant began cutting the cash drawer into pieces with tin snips and put them in a bag.

. . . .

On November 20, 1998, Arlington Detective Noel E. Hanrahan obtained pieces of the cash register drawer from Grant. Four days later, Lovitt was arrested and charged with the present offenses. . . . When Officer Stephen Ferrone collected Lovitt's clothing at the jail, Ferrone asked a detective whether he needed to seize Lovitt's jacket. Ferrone testified that, upon hearing this question, Lovitt stated, "I wasn't wearing it when it happened."

Julian J. Mason, Jr., a forensic scientist employed by the Virginia Division of Forensic Science, qualified as an expert witness on the subject of tool mark identification. He testified that the cash register drawer Grant surrendered to the police had been removed from the broken cash register found on

4

the floor of the pool hall.  Mason also stated that the pry marks on the cash register drawer were made by the scissors that were found in the woods behind the pool hall.

. . . .

Carol Palmer, a forensic scientist employed by the Virginia Department of Forensic Science, qualified as an expert witness on DNA testing.  Palmer extracted human DNA from two places on the scissors, on a blade near the tip and on a blade near the finger loops.  She also extracted blood from three small circular areas on the left front side of Lovitt's jacket, but the DNA tests were inconclusive and Palmer was unable to determine whether the blood on the jacket was human. . . .

. . . The DNA extracted from the tip of the scissors displayed a DNA profile that matched the DNA profile of Dicks.  The profile derived from this sample did not match the DNA profiles of either Lovitt or Grant, thus eliminating both as contributors of this DNA.  Palmer stated that the chance of someone other than Dicks contributing the DNA sample on the tip of the scissors was 1 in more than 5.5 billion.

The DNA extracted from the mid-section of the scissors also matched the DNA profile of Dicks.  However, Palmer stated that this DNA evidence, unlike the DNA evidence from the tip of the scissors, did not exclude either Lovitt or Grant and, thus, was inconclusive as to them.

After Lovitt's arrest, he was incarcerated in the Arlington County Jail in the same unit as Casel Lucas.  Lovitt and Lucas developed a friendship during the two months that they lived together in this unit.  Lovitt first told Lucas that after leaving the bathroom at the pool hall on the night of the murder, Lovitt saw a Hispanic man stabbing Dicks.  Lovitt told Lucas that, at that time, Lovitt saw the cash register drawer, grabbed it, and ran from the pool hall.

According to Lucas, Lovitt later stated that he knew Dicks and was aware that no one else would be in the pool hall late at night.  Lovitt further related

5

that he waited in the bathroom until everyone left the pool hall before coming out of the bathroom to attempt to open the cash register drawer.  Dicks confronted Lovitt as he unsuccessfully attempted to open the cash drawer.  Lovitt told Lucas that he had to kill Dicks because Dicks had recognized him.  According to Lovitt, Dicks asked him, "[W]hy [are] you doing this?"  Lovitt admitted to Lucas that he stabbed Dicks several times and took the cash register drawer to his cousin's house where he and his cousin split the money before leaving to buy some drugs.  Lovitt told Lucas that he discarded the murder weapon while en route to or from Grant's house, and that he changed his clothes at Grant's house because he had blood on his shirt and pants.

. . . .

During the penalty phase of the trial, the Commonwealth presented evidence of Lovitt's criminal record.  In October 1975, when Lovitt was 11 years old, he was charged with assault and placed in protective supervision.  Also as a juvenile, in August 1979, Lovitt was committed to the Beaumont Learning Center of the State Department of Corrections (Beaumont) based on adjudication of charges of breaking and entering and larceny.  While at Beaumont, Lovitt was disciplined for fighting, assault, and possessing contraband items.  After his release from Beaumont in 1980, Lovitt was convicted of grand larceny in 1981 and was sentenced to 12 months in jail.

Between 1983 and 1985, Lovitt was convicted of petit larceny, grand larceny, breaking and entering, and distribution of marijuana.  In 1986, Lovitt was convicted of attempted robbery and was sentenced to a term of imprisonment of from one to three years.  After being released on parole in August 1987, Lovitt's parole was revoked in August 1988 based, in part, on additional arrests and his failure to pass certain drug tests.  Lovitt later was convicted of statutory burglary and grand larceny.  While incarcerated on these convictions and the parole violation, Lovitt was disciplined for damaging property and for fighting.

6

In September 1990, Lovitt again was released on parole. In early 1991, Lovitt was convicted of possession of cocaine, grand larceny, and burglary. While incarcerated on these charges, Lovitt was the subject of ten disciplinary actions for offenses including possession of contraband, disobeying direct orders, assault, possession of intoxicants, and manufacturing "shank handles." After being released on parole in October 1996, Lovitt was convicted in 1997 of possession of marijuana, petit larceny, unlawful entry, assault and battery, and destruction of property. Lovitt was on parole at the time of the present offenses.

In October 1998, Arlington County Police Officer Jerome A. Lee detained Lovitt in an apartment parking lot in Arlington. Lovitt had parked his car behind the apartments, appeared to be very nervous, and consented to a search of his vehicle. Lee found a long kitchen knife on the floor of the passenger area and a soda can used to smoke crack cocaine in the rear floor area of the vehicle.

Lovitt presented testimony from his sister, [Lamanda] Jones, who testified that Lovitt was the oldest of 12 children and that he helped take care of his younger siblings, although not "gladly." Lovitt also presented testimony from four deputies employed by the Arlington County Sheriff's Office, who stated that Lovitt had not presented any disciplinary problems while being held in jail on the present charges.

Id. at 502-08, 537 S.E.2d at 870-73.

In May 2001, about six months after we affirmed Lovitt's convictions, the circuit court entered an order authorizing destruction of the exhibits entered into evidence at Lovitt's trial. Pursuant to the destruction order, all exhibits received in evidence at trial, with the exception of one chart, were destroyed. On October 1, 2001, the United States Supreme Court

7

denied Lovitt's petition for a writ of certiorari from this
Court's judgment.  See Lovitt v. Virginia, 534 U.S. 815 (2001).

## II. STANDARD OF REVIEW

When we consider a circuit court's findings of fact and
recommended conclusions of law submitted pursuant to Code
§ 8.01-654(C), we defer to the court's factual findings and are
bound by them unless they are plainly wrong or without
evidentiary support.  Hedrick v. Warden, 264 Va. 486, 496, 570
S.E.2d 840, 847 (2002).  However, the circuit court's
recommended conclusions of law involve mixed questions of law
and fact and are subject to our de novo review.  Id.

## III.  HABEAS HEARING

At the habeas hearing, Lovitt presented evidence regarding
the destruction of the trial exhibits, the alleged Brady
violations, and his counsel's alleged failure to provide
effective assistance at trial.

## A.  DESTRUCTION OF EVIDENCE

Testimony at the habeas hearing revealed that in April
2001, Robert C. McCarthy, Chief Deputy Clerk of the Circuit
Court of Arlington County, drafted an order authorizing the
destruction of the exhibits received in evidence at Lovitt's
trial.  McCarthy, who was responsible for evidence stored in the
clerk's office, testified that he thought he was authorized to
destroy the trial exhibits after receiving a mandate from this

8

Court indicating that Lovitt's convictions were affirmed. McCarthy also stated that he decided to destroy the trial exhibits to create additional space in the clerk's office evidence room.

McCarthy drafted the evidence destruction order without consulting anyone in the Commonwealth's Attorney's office, the Attorney General's office, or the Arlington County Police Department. McCarthy also did not notify any of the circuit court judges, Lovitt's trial counsel, or his habeas counsel of the impending evidence destruction.

McCarthy drafted the order before May 2, 2001, the date that Code §§ 19.2-270.4:1 and -327.1 became effective. Code § 19.2-270.4:1 provides, in relevant part:

> B.  In the case of a person sentenced to death, the court that entered the judgment shall, in all cases, order any human biological evidence or representative samples to be transferred by the governmental entity having custody to the Division of Forensic Science. The Division of Forensic Science shall store, preserve, and retain such evidence until the judgment is executed. . . .
>
> . . . .
>
> E.  An action under this section or the performance of any attorney representing the petitioner under this section shall not form the basis for relief in any habeas corpus or appellate proceeding.

With regard to such human biological evidence, Code § 19.2-327.1 provides, in relevant part:

9

A. Notwithstanding any other provision of law or rule of court, any person convicted of a felony may, by motion to the circuit court that entered the original conviction, apply for a new scientific investigation of any human biological evidence related to the case that resulted in the felony conviction . . . .

. . . .

G. An action under this section or the performance of any attorney representing the petitioner under this section shall not form the basis for relief in any habeas corpus proceeding or any other appeal.

McCarthy took the destruction order prepared in Lovitt's case, along with between 15 and 20 other such orders, to the chambers of Judge Paul F. Sheridan. McCarthy left the orders in Judge Sheridan's chambers for entry without providing him any information concerning the relevant cases. Judge Sheridan, who did not conduct Lovitt's trial, entered the destruction orders on May 21, 2001, authorizing the destruction of all exhibits entered into evidence at Lovitt's trial. These exhibits, with the exception of the one chart, were destroyed a few days later.

Two deputy court clerks, Clifford P. Kleback and Gwendolyn Gilmore, testified that they spoke with McCarthy before he submitted the destruction orders to Judge Sheridan. Both deputy clerks told McCarthy, who was their immediate supervisor, that he should not destroy the evidence in Lovitt's case because it was a "capital case" and Lovitt had not been executed. Kleback, who was the clerk assigned to the courtroom during Lovitt's trial, stated that he told McCarthy that the case involved DNA

10

evidence, and that he repeatedly advised McCarthy not to destroy the evidence.

Both Kleback and Gilmore testified that McCarthy told them that the evidence could be destroyed because Lovitt's appeal had ended. Kleback and Gilmore deferred to McCarthy's decision and, at that time, did not report these conversations to either the clerk of the circuit court or to anyone in the prosecutor's office.

McCarthy testified that he did not recall speaking with Kleback and Gilmore before the evidence in Lovitt's case was destroyed. McCarthy also stated that he did not review Lovitt's case file to determine whether Lovitt's appellate remedies were exhausted but instead relied on this Court's mandate affirming Lovitt's convictions. According to McCarthy, when he drafted the destruction order, he may have known that Lovitt's case was a "capital murder case," but he was unaware that it was a "death penalty case." He further testified that at the time the destruction order was entered, he was not aware of any change in the law concerning the preservation of human biological evidence.

The circuit court found that there was no evidence that any official of the Commonwealth acted in bad faith or with the intent to destroy exculpatory evidence. The court stated in its findings that "McCarthy believed he had the authority to destroy

11

the trial exhibits once he received the mandate" from this Court. The court also found that although Code § 19.2-270.4:1 became effective 20 days before entry of the destruction order, McCarthy was unaware of the statute's provisions when the evidence was destroyed.

## B. BRADY CLAIMS

### 1. DR. PIERRE-LOUIS

Dr. Marie-Lydie Y. Pierre-Louis was the medical examiner who performed the autopsy on Clayton Dicks. Among those present during the autopsy were Assistant Commonwealth's Attorney Margaret E. Lair-Eastman (Eastman), one of the prosecuting attorneys at Lovitt's trial, and Detective Stuart Chase of the Arlington County Police Department.

During the autopsy, Dr. Pierre-Louis was shown two pairs of scissors recovered from a container next to the cash register near the location where Dicks' body was found. Dr. Pierre-Louis was not shown the orange-handled pair of scissors found with blood on the blade tip (the bloody scissors), discovered in the woods behind the pool hall and admitted into evidence at Lovitt's trial.

The autopsy report prepared by Dr. Pierre-Louis indicated that each of Dicks' six stab wounds displayed a blunt and a sharp edge. The wounds ranged in depth between three and eight

12

inches, and three of these wounds were between six and eight inches deep.

The autopsy report further indicated that one of the pairs of scissors examined by Dr. Pierre-Louis had a total length of eight-and-one-half inches with blades that were three-and-one-half inches long and one-half inch wide at the base. The other pair of scissors she examined was six-and-one-half inches in length and had blades that were three inches long and one-half inch wide at the base.

At the autopsy, Dr. Pierre-Louis told Eastman and Detective Chase that neither of the two pairs of scissors that she examined could have been the murder weapon because the length and width of their blades were not consistent with the nature and dimensions of Dicks' stab wounds. Dr. Pierre-Louis also told Eastman and Chase that she would have to examine the bloody scissors before she could reach a conclusion whether those scissors were the source of Dicks' wounds.

Dr. Pierre-Louis' opinion concerning the two pairs of scissors she examined was not included in the autopsy report. Neither Eastman nor anyone else in the prosecutor's office informed Lovitt's trial counsel of Dr. Pierre-Louis' opinion. During Lovitt's trial, Dr. Pierre-Louis was not asked to give her opinion concerning the two pairs of scissors that she had

examined, nor was she asked to opine whether the bloody scissors admitted into evidence were consistent with Dicks' stab wounds.

At the habeas hearing, Dr. Pierre-Louis testified that she is an "expert on the wounds on the body" and that part of her expertise includes determining "whether an object is consistent with a wound." Dr. Pierre-Louis stated that each of Dicks' stab wounds had both a blunt and a sharp edge, indicating that a "single-edged blade" was used to cause those wounds.

Dr. Pierre-Louis was shown a photograph of the bloody scissors found in the woods near the pool hall. Using a measurement scale depicted in the photograph, she determined that one blade was three-and-one-half inches long from its tip to the base where the two blades are joined, and that this blade was one-half inch wide at the base. She was unable to measure the other blade because of its position in the photograph.

Dr. Pierre-Louis testified that the bloody scissors shown in the photograph were inconsistent with Dicks' wounds. She stated that three of those wounds, which measured between six and eight inches in depth, were deeper than the length of the three-and-one-half inch blade. She also stated that while the other three wounds, which ranged between three and five inches in depth, were "more or less" consistent with the length of the blade, the wounds were twice as wide as the width of the blade.

14

Dr. Pierre-Louis further testified that if the blade had been completely inserted into Dicks' body, she would have expected to discover a "notch" from the other blade or a contusion from the scissors' handle in the immediate vicinity of the stab wounds. However, she did not discover any evidence of such "marginal abrasions" near Dicks' wounds. Dr. Pierre-Louis completely discounted "tissue compression" as an explanation for the discrepancy between the scissors' blade length and Dicks' wounds because of the lack of "marginal abrasions" in the wound areas. She stated that the discovery of Dicks' blood on the scissors would not influence her opinion that those scissors are inconsistent with Dicks' wounds because she does not know how the blood was transferred to those scissors.

On cross-examination, Dr. Pierre-Louis testified that she never examined the bloody scissors depicted in the photograph and was unable to determine the thickness of the blades or whether their outside edges were sharp. Contrary to her testimony on direct examination, she conceded that it was possible that a single blade of the scissors depicted in the photograph could have caused the three stab wounds that measured between three and five inches deep.

Both Detective Chase and Deputy Commonwealth's Attorney Barbara Walker, one of the prosecuting attorneys at Lovitt's trial, testified that the bloody scissors were different in size

15

from the two pairs of scissors presented to Dr. Pierre-Louis. Detective Chase also testified that he contacted Dr. Pierre-Louis after the autopsy and informed her that the police had recovered a certain pair of scissors that he concluded was the murder weapon, which he described to her. He stated that when he described the bloody scissors to Dr. Pierre-Louis, "she made some comment that, I guess I was wrong, or, I made a mistake."

Eastman testified that when she told Dr. Pierre-Louis after the autopsy that Dicks' blood had been identified on the bloody pair of scissors, Dr. Pierre-Louis shrugged and responded, "oh well." Eastman interpreted Dr. Pierre-Louis' response as a departure from her previous opinion and an abandonment of "any notion that scissors could not be the murder weapon."

Eastman testified that Lovitt's counsel had a copy of the autopsy report and had access to the physical evidence in the case, including the bloody scissors. She further testified that she did not consider Dr. Pierre-Louis' opinion concerning the two pairs of scissors to be exculpatory because neither pair was the murder weapon presented at trial.

Denman Rucker, one of Lovitt's trial attorneys, testified at the habeas hearing that the trial evidence concerning the bloody scissors "actually worked to [his] benefit" during trial, and allowed him to assert that an unknown assailant had perpetrated the crimes, which was the "strongest argument"

16

available for Lovitt's defense.  Rucker explained that this evidence also allowed him to avoid having the jury infer that Lovitt brought a deadly weapon with him to the pool hall.

The circuit court made a factual finding that after DNA test results confirmed the presence of Dicks' blood on the bloody scissors, "Dr. Pierre-Louis indicated to the Commonwealth's attorneys that she had been wrong in her conclusion regarding the scissors."  The court also found that Lovitt's defense counsel had access to the bloody scissors, the autopsy report, and to Dr. Pierre-Louis prior to Lovitt's trial.

Based on additional testimony by Denman Rucker, the circuit court also found that Rucker had recognized the differences in the blade lengths of the scissors listed in the autopsy report and the depth of Dicks' wounds and, as a result, had consulted with an expert at the Northern Virginia Forensic Laboratory. Rucker further testified that the expert informed him that a pair of scissors with a blade measuring between three-and-one-half and four-and-one-half inches in length could inflict a wound up to seven inches deep during a "frenzied" and "violent" attack based on a victim's breathing and the compression of body tissue.  The court found that the expert informed Rucker that such scissors could have been the murder weapon.

### 2.   CASEL LUCAS

#### a.   LUCAS' PRIOR COOPERATION WITH AUTHORITIES

Before Lucas testified at trial, Eastman and Walker provided Lovitt's defense counsel with a report detailing Lucas' extensive criminal record. However, neither Eastman nor Walker disclosed to defense counsel that Lucas had provided information to various police departments in four previous criminal cases. The circuit court found that before the trial, the prosecutors in Lovitt's case were "unaware that Casel Lucas had provided information regarding any other case."

The evidence at the habeas hearing showed that in 1998, Lucas testified in Alexandria against Steven Evans, who had been charged with robbery. In exchange for his testimony, Lucas received a total recommended sentence of 20 years' imprisonment for various pending criminal charges, including robbery, abduction with the intent to defile, and attempted rape.

Walker testified that although Lucas told her about his cooperation with the police in the Evans case, she did not tell either Rucker or Janell Wolfe, Lovitt's co-counsel at trial, about Lucas' role in that prosecution. However, Walker stated that Lucas' sentence in the Evans case was included in his criminal record that the prosecution provided to defense counsel before Lucas testified.

When Wolfe interviewed Lucas prior to his testifying, Lucas told her of his involvement in the Evans case. However, Lucas did not inform Wolfe that he had cooperated with the police in

18

any other cases.  Wolfe testified that had she received such information, she and Rucker would have used it to impeach Lucas' credibility at trial.  At Lovitt's trial, Rucker cross-examined Lucas concerning his cooperation with the police in the Evans case.

In 1996, Lucas provided information to the police concerning a "jailhouse confession" made by Edward Young, who had been charged with rape in Arlington County.  Walker served as the prosecutor during the sentencing in the Young case and Wolfe served as Young's counsel.  However, neither Walker nor Wolfe was aware of Lucas' involvement in the Young case because the case did not proceed to trial and the defendant's plea agreement did not mention Lucas.  Lucas did not receive any benefit in exchange for the information that he provided in the Young case.

In 1997, Lucas provided information to detectives in the District of Columbia concerning the "Starbucks triple homicide" case.  One of the detectives sent a letter to the judges of the Circuit Court of the City of Alexandria informing them of Lucas' cooperation in the Starbucks case.  There was no evidence that Lucas received any benefit resulting from his cooperation with the police in that case.  Further, prior to Lovitt's trial, the Arlington prosecutors did not have any information about Lovitt's cooperation in the Starbucks case.

In 1998, Lucas provided Alexandria authorities with a statement detailing a defendant's "jailhouse confession" in the "Eddie Lee case." Lucas did not receive any benefit as a result of his cooperation in that case, and the Arlington prosecutors were not aware of Lucas' involvement in the Lee case prior to Lovitt's trial.

In June 1999, before Lovitt's trial, Lucas sent a letter to Judge Paul F. Sheridan of the Arlington County Circuit Court requesting reconsideration of one of his sentences. In the letter, Lucas stated that he had cooperated with the police in previous matters but did not mention Lovitt's case. The letter was sent directly to Judge Sheridan's chambers and a copy of the letter apparently was not placed in Lucas' file until after Lovitt's trial. Lucas' request for reconsideration was denied. The prosecutors in Lovitt's case were not aware of Lucas' letter at the time of Lovitt's trial.

b.  LUCAS' PRIOR INCONSISTENT STATEMENTS

At the habeas hearing, the court considered an affidavit handwritten by Lovitt's habeas counsel and signed by Lucas in September 2001. The affidavit, which was prepared after Lovitt's trial, contained several statements that conflicted with Lucas' trial testimony. For example, in the affidavit, Lucas stated that he initially informed the prosecutors that Lovitt had stated he used a gun to shoot Dicks, that Lovitt had

20

discarded the weapon in a drain, and that Warren Grant had driven Lovitt from the pool hall to Grant's house. These statements contradicted Lucas' trial testimony that Lovitt stated he used a knife or other object to stab Dicks, and that he discarded the weapon while walking from the pool hall to Grant's house.

In the affidavit, Lucas also stated that he received a reduced sentence for his cooperation in the Young case, and that he learned about the details of Dicks' murder from "Crime Stoppers" and the Washington Post. At habeas counsel's request, Lucas had "initialed" each paragraph of the affidavit.

Lucas testified that the inconsistent statements contained in the affidavit were not accurate and that his testimony during Lovitt's trial was truthful. Lucas stated that on the day he signed the affidavit, he was "confused" after answering "three hours' worth of questions" posed by Lovitt's habeas counsel. Lucas also stated that he did not feel "too good" that day because he had undergone a tooth extraction and was waiting to receive some medication.

Lucas further testified that he did not thoroughly read the affidavit, but merely "glimpsed through it" and "glanced over it," not paying attention to its content. He also testified that he was mistaken when he had stated that he received a sentence reduction in exchange for his cooperation in the Young

case.  Additionally, Lucas stated that Lovitt was his sole source of information concerning the testimony he gave at Lovitt's trial.

Eastman testified that Lucas' trial testimony was consistent with the statements he had made before Lovitt's trial.  She stated that Lucas' description of Lovitt's initial story was consistent with a statement that Lovitt had given to the police shortly after his arrest.  Included in Lovitt's initial story to Lucas were assertions that Lovitt was in the pool hall restroom during Dicks' murder, and that he took the cash register drawer after an allegedly unknown assailant had killed Dicks.[2]

The circuit court found that Lucas had "disavowed" the affidavit written by Lovitt's habeas counsel that had set forth the inconsistent statements Lucas allegedly had made before trial.  The court also found that Lucas did not make any statements before trial that were inconsistent with his trial testimony.

C.   INEFFECTIVE ASSISTANCE OF COUNSEL

---

[2] In that statement to the police, Lovitt claimed that when he discovered Dicks on the pool hall floor "gurgling blood" and "dying right there on the spot," he thought to himself, "I'm broke.  Might as well take [the cash register drawer] with me," and then he grabbed the drawer and left the premises.  Lovitt's statement to the police was not entered into evidence at Lovitt's trial.

Two of Lovitt's stepsisters and a cousin testified at the habeas hearing about Lovitt's family background. We will describe that testimony in detail in Part IV(C), infra, of our discussion which addresses the issue whether Lovitt received effective assistance of counsel at trial. In that discussion, we will also describe the various jail, substance abuse, juvenile, and other records introduced into evidence at the habeas hearing.

Rucker and Wolfe testified at the habeas hearing that they were concerned that if the jury was told about the criminal records and substance abuse of Lovitt's siblings and stepfather, the jury could conclude that Lovitt's family background increased his future danger to society. Wolfe also stated that she asked Lamanda Jones to testify on Lovitt's behalf and spoke with her for between "45 minutes or an hour" before presenting her as a witness in the penalty phase proceeding. Wolfe explained that Jones testified regarding "exactly what we wanted her to get on the stand and say," and that Jones' testimony "humanized" Lovitt by showing the jury that he had a family.

With regard to the guilt phase of the trial, the circuit court found that defense counsel made a tactical decision not to pursue additional DNA testing of the bloody scissors and Lovitt's jacket, which allowed counsel to argue that an unknown assailant killed Dicks. The court concluded that Rucker's

23

investigation into the discrepancy between the length of the scissors and the depth of Dicks' stab wounds yielded information from an expert that scissors of the specified dimensions could have caused such wounds. The court also found that Wolfe interviewed Lucas and obtained his criminal record prior to his testifying at Lovitt's trial.

With regard to the penalty phase of the trial, the circuit court found that trial counsel adopted a strategy for the penalty phase that focused on efforts to "humanize" Lovitt and to show that he would not be dangerous in the penitentiary by emphasizing his good behavior while he was incarcerated awaiting trial. The court also found that in preparation for trial, Rucker and Wolfe obtained "all of Lovitt's jail records from the Arlington County Detention Facility, all of his juvenile records, his records from the Beaumont juvenile facility, his medical records, and his pre-sentence report."

The court further found that both Rucker and Wolfe were aware of the criminal history of Lovitt's family members from having represented some of his siblings in prior criminal proceedings, and from their "general reputation in the community" of having a "predilection for criminal activity." The court found that trial counsel made a strategic decision not to introduce evidence of Lovitt's family background, and that the social services records of Lovitt's siblings would not have

24

assisted defense counsel in preparing for the penalty phase of the trial.  In addition, the court found that Lovitt had not given trial counsel any indication that he had been a victim of sexual or physical abuse by his stepfather.

## IV. DISCUSSION

### A.  DESTRUCTION OF EVIDENCE

Lovitt argues that McCarthy, an agent of the Commonwealth, procured the destruction of the trial exhibits in bad faith, and that the destruction of this evidence violated his right of due process by preventing meaningful review of his habeas corpus petition.  Lovitt also observes that under Code §§ 19.2-270.4 and -270.4:1, trial evidence may not be destroyed until after all appellate remedies have been exhausted, and that DNA evidence in a death penalty case may not be destroyed until the final judgment is executed.  He asserts that the death penalty is "not a reliably appropriate punishment" under circumstances when material evidence has been destroyed and that, therefore, his sentence should be vacated.  We disagree with Lovitt's arguments.

We first address Lovitt's due process claim.  He asserts that he is entitled to habeas corpus relief because he has been deprived of an opportunity to seek new scientific testing of the DNA found on the bloody scissors and his jacket.  Lovitt asserts that this testing is necessary for him to seek a writ of actual

25

innocence under Code §§ 19.2-327.2 through -327.6.[3]  However, he fails to present authority to support his claim that habeas corpus relief is the proper remedy for his inability to obtain this further testing.  He further acknowledges that the United States Supreme Court has not addressed the question whether due process rights may be asserted against the post-trial destruction of evidence.

In the absence of such authority, Lovitt relies on Arizona v. Youngblood, 488 U.S. 51 (1988), and California v. Trombetta, 467 U.S. 479 (1984), in which the Supreme Court considered due process claims involving the pre-trial destruction of evidence. In Youngblood, the Supreme Court drew a distinction between the government's failure to disclose material exculpatory evidence and the failure to preserve potentially exculpatory evidence. The Court explained that:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. . . .  We think that requiring a defendant

---

[3] Lovitt also asserts that further DNA testing of these items is required in order to establish that he was denied the effective assistance of counsel at trial.  However, based on our resolution of this aspect of his ineffective assistance claim, infra, we need not address the destruction of these items as they relate to the ineffective assistance claim.

to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.  We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

488 U.S. at 57-58; see also Trombetta, 467 U.S. at 489; Thomas v. Commonwealth, 244 Va. 1, 18, 419 S.E.2d 606, 615-16 (1992).

This constitutional standard of materiality, decided in the context of a state's pre-trial destruction of evidence, reflects the importance courts attach to the integrity of the trial process and to the ability of an accused to defend against criminal charges brought against him.  See Trombetta, 467 U.S. at 485.  Therefore, during the course of a criminal trial, the Due Process Clause of the Fourteenth Amendment requires that the government satisfy such prevailing concepts of fundamental fairness.  See id.

In a habeas corpus proceeding, however, the truth-seeking function of the trial process yields to a focus on the legality of a petitioner's detention and whether the petitioner presently is detained in violation of any constitutional rights.  See Virginia Parole Bd. v. Wilkins, 255 Va. 419, 420-21, 498 S.E.2d 695, 696 (1998); McClenny v. Murray, 246 Va. 132, 134-35, 431

S.E.2d 330, 331 (1993); Smyth v. Holland, 199 Va. 92, 96-97, 97

S.E.2d 745, 748-49 (1957).  This different focus raises the

issue whether a due process right may be asserted in a habeas

corpus proceeding to challenge the post-trial destruction of

evidence when a petitioner's trial and direct appeal have

concluded.

We need not resolve this issue in the present case,

however, because Lovitt fails to establish that he qualifies for

relief under the Youngblood standard that he asks us to apply.

Therefore, for purposes of this petition only, we will assume,

without deciding, that a habeas petitioner may assert a due

process claim regarding the post-trial destruction of evidence,

and that the Youngblood standard governing pre-trial destruction

of evidence also applies to a due process claim involving

evidence destroyed post-trial.

As provided above, under the Youngblood standard, a state's

failure to preserve potentially useful evidence does not

constitute a denial of due process unless a defendant can show

bad faith on the part of the state.  Youngblood, 488 U.S. at 58;

United States v. Newsome, 322 F.3d 328, 334 (4th Cir. 2003);

Basden v. Lee, 290 F.3d 602, 615 (4th Cir. 2002), cert. denied,

537 U.S. 980 (2002); Thomas, 244 Va. at 18, 419 S.E.2d at 615.

The presence or absence of bad faith by the state depends on

whether agents of the state had knowledge of the exculpatory

28

value of the evidence when it was lost or destroyed. Youngblood, 488 U.S. at 56 n.\*; Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir. 1994).  Thus, the possibility that evidence could have exculpated a defendant depending on future testing results is not enough to satisfy the constitutional standard of materiality.  See Youngblood, 488 U.S. at 56 n.\*.

In the present case, the circuit court concluded that "[t]here [was] no evidence that any official of the Commonwealth acted in bad faith."  The court also found that "[t]here [was] no evidence to conclude that there was an intent by anyone in the Clerk's office to destroy exculpatory evidence."  The court further found that while Robert McCarthy's judgment was erroneous, he "wanted to remove the box of exhibits from the evidence room to make additional space," and he "believed he had the authority to destroy the trial exhibits once he received the mandate indicating that Lovitt's appeal to the Virginia Supreme Court had been denied."

The circuit court's determination that there was an absence of bad faith was a finding of fact, not of law, because that finding rested on the knowledge of the Commonwealth's agents concerning the exculpatory value of the evidence at the time it was destroyed.  See id.; Holdren, 16 F.3d at 60; Thomas, 244 Va. at 18, 419 S.E.2d at 615-16.  Such factual findings made by the circuit court are entitled to deference and are binding in this

proceeding unless they are plainly wrong or without evidence to support them.  Hedrick, 264 Va. at 496, 570 S.E.2d at 847.

The circuit court's findings concerning the absence of bad faith are supported by the evidence and are not plainly wrong. McCarthy's actions, and the failure of Kleback and Gilmore to report his intentions to another supervisor, do not establish that an agent of the Commonwealth had knowledge of any exculpatory value of the trial exhibits at the time they were destroyed.  See Youngblood, 488 U.S. at 56 n.*; Holdren, 16 F.3d at 60.  The mere fact that the exhibits included DNA evidence, and that Kleback may have related this information to McCarthy, does not establish that McCarthy was aware that an analysis of some of the DNA evidence had produced inconclusive results, or that such evidence may have been subject to further testing. Moreover, even if McCarthy had been aware of these considerations, such awareness would not have met the constitutional standard of materiality under Youngblood, because Lovitt can assert no more than the mere possibility that further testing could have exculpated him.  See Youngblood, 488 U.S. at 56 n.*.

In addition, the circuit court found that at the time the evidence was destroyed, McCarthy was unaware that Code § 19.2-270.4:1, enacted 20 days before the destruction order was entered, mandated the storage of human biological evidence

30

received in the case of a person sentenced to death. McCarthy's testimony adequately supports this finding.

The circuit court made an additional factual finding that no employees of either the Commonwealth's Attorney or the Attorney General knew about the destruction of evidence until after the destruction occurred. This finding is supported by the testimony of Margaret Eastman, Barbara Walker, and McCarthy. The record also shows that Judge Paul F. Sheridan, who entered the evidence destruction order, had not presided over Lovitt's trial. Therefore, we hold that the record lacks any evidence that an agent of the Commonwealth acted in bad faith with regard to the destruction of the trial exhibits.

We turn now to consider Lovitt's claim that he is entitled to habeas corpus relief because the destruction of the trial exhibits violated Code §§ 19.2-270.4 and -270.4:1. Code § 19.2-270.4(A) provides, in relevant part:

> Except as provided in § 19.2-270.4:1 and unless objection with sufficient cause is made, the trial court in any criminal case may order the donation or destruction of any or all exhibits received in evidence during the course of the trial (i) at any time after the expiration of the time for filing an appeal from the final judgment of the court if no appeal is taken or (ii) if an appeal is taken, at any time after exhaustion of all appellate remedies.

In the case of a person sentenced to death, Code § 19.2-270.4:1(B) requires the Commonwealth to store, preserve, and retain any human biological evidence, or representative samples

31

thereof, until the judgment is executed.  This statute also provides that any noncompliance with the terms of the statute "shall not form the basis for relief in any habeas corpus or appellate proceeding."  Code § 19.2-270.4:1(E).

In enacting Code §§ 19.2-270.4 and -270.4:1, the General Assembly provided for both the retention of trial evidence, including evidence containing DNA, and the ultimate disposal of such evidence when all appellate remedies have been exhausted and judgment has been executed.  Such procedures protect the efficacy of the appellate process, as well as the need to preserve evidence for use in the event of a retrial or other proceeding allowed by law.  However, in stating the procedural requirements relating to the retention of human biological evidence in Code § 19.2-270.4:1, the General Assembly also recognized that noncompliance with those procedures may occur and provided statutory language plainly excluding any such noncompliance as a basis for appellate or habeas corpus relief.

Based on this unambiguous statutory proscription, we find no merit in Lovitt's contention that the Commonwealth's failure to comply with either statute's provisions relating to human biological evidence presented at his trial entitles him to habeas corpus relief.  Thus, we hold that Lovitt has failed to advance any valid basis for habeas corpus relief arising from the destruction of the trial exhibits in his case.

32

B.  BRADY CLAIMS

Lovitt argues that the Commonwealth failed to disclose certain exculpatory evidence before trial.  He contends that Dr. Pierre-Louis' comments at the autopsy concerning the scissors she examined were exculpatory, and that the Commonwealth's failure to disclose this information prejudiced him because these comments directly contradicted the Commonwealth's theory that Dicks was murdered with a pair of scissors.  Lovitt also argues that the Commonwealth was required to disclose evidence of Lucas' allegedly inconsistent prior statements and his cooperation with different law enforcement authorities, and asserts that such information could have been used to attack Lucas' credibility at trial.[4]

In response, the warden argues that Dr. Pierre-Louis' comments were not exculpatory because she did not examine the bloody scissors that were admitted at trial and those scissors were different in size from the two pairs of scissors she actually examined.  The warden also asserts that Casel Lucas did not make any prior inconsistent statements that should have been disclosed by the Commonwealth, and that the Commonwealth was not

---

[4] We do not consider Lovitt's additional contention that the Commonwealth engaged in misconduct by arguing to the jury that the bloody scissors were the murder weapon when the Commonwealth knew of Dr. Pierre-Louis' comments concerning the other scissors examined during the autopsy.  Lovitt failed to make this allegation in his habeas petition.  See Code § 8.01-654(B)(2).

required to disclose Lucas' cooperation in other criminal cases of which the Commonwealth was unaware at the time of Lovitt's trial.

We review these claims under settled constitutional principles concerning the disclosure of exculpatory evidence. In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that a due process violation occurs when the prosecution suppresses evidence favorable to an accused that is material either to guilt or to punishment, irrespective whether the prosecution acted in good faith or bad faith. Id. at 87; see also Strickler v. Greene, 527 U.S. 263, 280 (1999); Kyles v. Whitley, 514 U.S. 419, 432 (1995); Soering v. Deeds, 255 Va. 457, 464, 499 S.E.2d 514, 517 (1998); Bowman v. Commonwealth, 248 Va. 130, 133, 445 S.E.2d 110, 111 (1994).

Exculpatory evidence is material if there is a reasonable probability that the proceeding would have resulted in a different outcome had the evidence been disclosed to the defense. Strickler, 527 U.S. at 280; Kyles, 514 U.S. at 433; United States v. Bagley, 473 U.S. 667, 682 (1985); Cherrix v. Commonwealth, 257 Va. 292, 302, 513 S.E.2d 642, 649, cert. denied, 528 U.S. 873 (1999); Soering, 255 Va. at 464, 499 S.E.2d at 517; Bowman, 248 Va. at 133, 445 S.E.2d at 112. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome of the proceeding. Kyles, 514 U.S. at

34

434; Bagley, 473 U.S. at 682; Soering, 255 Va. at 464, 499 S.E.2d at 517; Bowman, 248 Va. at 133, 445 S.E.2d at 112. At the heart of this inquiry is a determination whether the evidence favorable to the defendant could reasonably be considered as placing the entire case in such a different light that confidence in the verdict is undermined. Strickler, 527 U.S. at 290; Kyles, 514 U.S. at 435.

The Brady disclosure requirements extend to information that can be used to impeach a witness' credibility. Strickler, 527 U.S. at 282 n.21; Bagley, 473 U.S. at 676; Bramblett v. Commonwealth, 257 Va. 263, 276, 513 S.E.2d 400, 409, cert. denied, 528 U.S. 952 (1999); Goins v. Commonwealth, 251 Va. 442, 456, 470 S.E.2d 114, 124, cert. denied, 519 U.S. 887 (1996). A prosecutor's suppression of impeachment evidence creates a due process violation only if the suppression deprives the defendant of a fair trial under the Brady standard of materiality. Bagley, 473 U.S. at 678; see McDowell v. Dixon, 858 F.2d 945, 949 (4th Cir. 1988).

This due process analysis requires consideration on an item-by-item basis whether the evidence at issue was exculpatory. Kyles, 514 U.S. at 436 n.10; United States v. Ellis, 121 F.3d 908, 916 (4th Cir. 1997). However, the determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative effect.

*Kyles*, 514 U.S. at 436 n.10; *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003); *Ellis*, 121 F.3d at 916.

We first consider Dr. Pierre-Louis' comments made at the autopsy that the two pairs of scissors she was shown were not consistent with Dicks' wounds. As stated above, both Detective Chase and Barbara Walker testified that these scissors were not the same size as the bloody scissors, which were the scissors introduced at trial. In addition, after the bloody scissors were subjected to DNA testing, which showed that Dicks' blood was on the tip of the scissors, Dr. Pierre-Louis told Detective Chase that she had been wrong in her earlier conclusion regarding the pairs of scissors she examined.

We conclude that Dr. Pierre-Louis' opinion concerning the scissors presented at the autopsy was not exculpatory evidence because that opinion related to scissors that were not introduced into evidence, were not the alleged murder weapon, and were not shown to be the same size as the alleged murder weapon. Her initial opinion also was not exculpatory in light of the circuit court's factual finding, supported by the testimony of Detective Chase, that Dr. Pierre-Louis changed her opinion before trial. Therefore, we hold that the prosecution was not required to provide the defense information concerning Dr. Pierre-Louis' initial opinion stated at the autopsy.

Because Dr. Pierre-Louis' statement was not exculpatory, we are not required to consider the issue of the materiality of that evidence. Nevertheless, we observe that the Commonwealth's failure to disclose this information could not have prejudiced Lovitt's defense because Dr. Pierre-Louis conceded at the evidentiary hearing in the present case that two of Dicks' fatal wounds, designated on the autopsy report as wounds #2 and #3, could have been caused by the bloody scissors. This acknowledgement that the bloody scissors could have been the source of two of Dicks' fatal wounds completely negates Lovitt's claim that there is a reasonable probability that his trial would have resulted in a different outcome if Dr. Pierre-Louis' initial opinion had been provided to the defense.

In addition, as the circuit court found, the evidence in the present case showed that trial counsel Denman Rucker investigated before trial whether the scissors like those presented at the autopsy could have caused Dicks' wounds. Upon consultation with a forensic expert, Rucker was told that scissors of that approximate size could have caused Dicks' wounds. Thus, Lovitt cannot show he was prejudiced by the Commonwealth's failure to inform him of Dr. Pierre-Louis' initial opinion, because he was aware of the issues involving scissors of that approximate size and investigated those issues as part of his defense in Lovitt's trial.

We next consider the issue whether the Commonwealth failed to disclose material exculpatory evidence concerning Casel Lucas that could have been used to impeach his credibility at trial. Although the circuit court received evidence that Lucas had provided information to the police on several occasions, the evidence showed that on only one such occasion, the Evans prosecution in Alexandria, did Lucas receive any benefit from his cooperation with the police.

When a person has provided information to governmental agents about the commission of a crime for which he received a benefit in the disposition of criminal charges against him, this fact may be used to impeach his credibility when he testifies as a witness for the prosecution. See Giglio v. United States, 405 U.S. 150, 154-55 (1972); Cargle v. Mullin, 317 F.3d 1196, 1215-16 (10th Cir. 2003); United States v. Lee, 867 F.2d 206, 207-08 (4th Cir. 1989). However, when a person does not receive a benefit from providing such information, and later testifies as a prosecution witness, the mere fact of his prior cooperation with the governmental agents does not constitute impeachment evidence subject to disclosure as exculpatory evidence. See Collier v. Davis, 301 F.3d 843, 849 (7th Cir. 2002), cert. denied, ___ U.S. ___, 123 S.Ct. 1290 (2003); Knox v. Johnson, 224 F.3d 470, 482 (5th Cir. 2000), cert. denied, 532 U.S. 975 (2001).

Applying these principles, the Commonwealth was required to provide Lovitt's trial counsel with information concerning Lucas' cooperation with the police in the Evans case. Thus, when we consider below the effect of undisclosed exculpatory evidence to determine its materiality, see Kyles, 514 U.S. at 436 n.10, we must include in our analysis the Commonwealth's failure to disclose this information about Lucas. However, because the record shows that Lucas did not receive a benefit for his cooperation in any of the other cases placed in issue by Lovitt, that cooperation did not constitute impeachment evidence subject to disclosure by the Commonwealth.

Lovitt also argues that Lucas made inconsistent statements to the police about Lovitt's case that were subject to disclosure by the Commonwealth under the Brady rule as impeachment evidence. In support of this allegation, Lovitt relies on the affidavit prepared by habeas counsel and signed by Lucas describing inconsistent statements made by Lucas to the police prior to Lovitt's trial. Among those statements were comments relating to the type of murder weapon, the means by which Lovitt left the scene of Dicks' killing, and the source of Lucas' information concerning the murder.

The circuit court found that Lucas did not make the inconsistent statements to the police detailed in the affidavit. This factual finding is supported by Lucas' testimony that he

39

did not read the entire affidavit prepared by habeas counsel before signing it, and that he did not agree with its contents. The circuit court's factual finding also is supported by Margaret Eastman's testimony that Lucas' statements before trial were consistent with those Lovitt gave to the police when he was arrested. Because the circuit court's finding is supported by the evidence, we conclude that Lovitt has not demonstrated that the Commonwealth failed to provide exculpatory evidence regarding statements Lucas made prior to trial.

We conclude our Brady inquiry by examining the effect of the one item of exculpatory evidence that the Commonwealth failed to disclose to Lovitt's trial counsel, namely, the fact that Lucas had received a benefit for his cooperation with the police in the Evans case. We conclude that the failure to disclose this evidence did not place Lovitt's trial in a posture that would undermine confidence in the verdict. See Strickler, 527 U.S. at 290; Kyles, 514 U.S. at 435. Wolfe learned this information before trial when she interviewed Lucas, and Rucker cross-examined Lucas at trial about the benefit Lucas received in the Evans case from his cooperation with the police. The jury also was informed that Lucas had been convicted of 13 felonies and was able to include this information in its assessment of Lucas' credibility. Thus, we hold that Lovitt's Brady claim is without merit.

40

## C.  INEFFECTIVE ASSISTANCE OF COUNSEL

Lovitt argues that his trial counsel provided ineffective assistance during both the guilt phase and the penalty phase of the trial.  With regard to the guilt phase, he challenges several decisions of his trial counsel, including their failure to have additional DNA tests performed on the bloody scissors and the jacket that he wore when he was arrested.  Among Lovitt's other contentions are that counsel failed to conduct a reasonable investigation of the alleged murder weapon, failed to conduct a thorough investigation of Casel Lucas, and failed to request a jury instruction on the credibility of "jailhouse informants."

Lovitt also argues that his trial counsel rendered ineffective assistance at the penalty phase because they failed to conduct an adequate investigation into his background and family history.  He asserts that trial counsel were required to perform such an investigation to ensure that counsel had made an informed decision regarding whether to present extensive mitigation evidence to the jury.  Lovitt maintains that he was prejudiced by trial counsel's failure to conduct an adequate investigation because evidence of his family background could

have reasonably convinced the jury to fix a sentence of life imprisonment.[5]

In response, the warden argues that Lovitt's trial counsel provided effective assistance during both the guilt phase and the penalty phase of the trial. With regard to the guilt phase, the warden contends that trial counsel's decisions were based on a careful strategy to emphasize the circumstantial nature of the evidence and the fact that the DNA evidence did not point to any single person as the perpetrator of the crime. With regard to the penalty phase, the warden asserts that trial counsel were adequately familiar with Lovitt's record and family background, and that Lovitt has failed to demonstrate prejudice because evidence of his personal history would have supported a conclusion that he was a future danger to society.

We consider Lovitt's claims under established principles of review. A defendant's right to counsel under the Sixth Amendment includes the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86 (1984); see Roe v. Flores-Ortega, 528 U.S. 470, 476 (2000); United States v. Cronic, 466 U.S. 648, 654 (1984); Sheikh v. Buckingham Corr.

---

[5]Lovitt also argues on brief that his trial counsel were ineffective at the penalty phase for failing to object to the jury verdict form. However, we do not consider this argument because Lovitt did not make this allegation in his petition for a writ of habeas corpus. See Sheikh v. Buckingham Corr. Ctr., 264 Va. 558, 565 n.1, 570 S.E.2d 785, 789 n.1 (2002).

42

Ctr., 264 Va. 558, 564, 570 S.E.2d 785, 788 (2002). Under this guarantee, a defendant is entitled to counsel who is reasonably competent and who gives advice that is within the range of competence required of attorneys in criminal cases. Strickland, 466 U.S. at 687; see Wiggins v. Smith, 539 U.S. ___, ___, 123 S.Ct. 2527, 2535 (2003); Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); Green v. Young, 264 Va. 604, 609, 571 S.E.2d 135, 138 (2002); Sheikh, 264 Va. at 564, 570 S.E.2d at 788. The issue whether counsel provided a defendant effective assistance at trial presents a mixed question of law and fact. Strickland, 466 U.S. at 698; see Sheikh, 264 Va. at 564, 570 S.E.2d at 788.

To prevail on a claim of ineffective assistance of counsel, a petitioner must ordinarily satisfy both parts of the two-part test set forth in Strickland. Strickland, 466 U.S. at 687; see Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Williams v. Taylor, 529 U.S. 362, 390 (2000). The petitioner first must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Bell v. Cone, 535 U.S. 685, 695 (2002); Williams, 529 U.S. at 390-91; Friedline v. Commonwealth, 265 Va. 273, 277, 576 S.E.2d 491, 493 (2003). In making this determination, the court considering the habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

43

professional assistance." Strickland, 466 U.S. at 689; see also Kimmelman, 477 U.S. at 381; Darden v. Wainwright, 477 U.S. 168, 185-86 (1986); Sheikh, 264 Va. at 564, 570 S.E.2d at 788.

To show that counsel's conduct fell outside the range of reasonable professional assistance, a defendant must overcome the presumption that under the particular circumstances presented, the challenged actions may be considered sound trial strategy. Strickland, 466 U.S. at 689; see Bell, 535 U.S. at 698; Darden, 477 U.S. at 186. However, "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" Wiggins, 539 U.S. at ___, 123 S.Ct. at 2541 (quoting Strickland, 466 U.S. at 690-91); see also Burger v. Kemp, 483 U.S. 776, 794 (1987).

With respect to the investigation and presentation of mitigation evidence, the Supreme Court observed in Wiggins that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins, 539 U.S. at ___, 123 S.Ct. at 2541.

Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the

44

investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable. Wiggins, 539 U.S. at ___, 123 S.Ct. at 2536; Strickland, 466 U.S. at 690-91. When making this assessment, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at ___, 123 S.Ct. at 2538.

If counsel's performance is found to have been deficient under the first part of the Strickland test, to obtain relief the petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542; Williams, 529 U.S. at 390-91; Hedrick v. Warden, 264 Va. 486, 496-97, 570 S.E.2d 840, 847 (2002).

A reviewing court, however, is not required to determine whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697; see also Strickler v. Murray, 249 Va. 120, 128, 452 S.E.2d 648, 652 (1995).

The reviewing court must make its prejudice determination by considering the totality of evidence before the trier of fact. Strickland, 466 U.S. at 695; see Kimmelman, 477 U.S. at 381. Further, when a prejudice determination concerns the failure to pursue the presentation of mitigation evidence, the reviewing court must evaluate the totality of the available mitigation evidence, both that adduced at trial and that presented at the habeas hearing which should have been presented at trial. Wiggins, 539 U.S. at ___, 123 S.Ct. at 2543; Williams, 529 U.S. at 397-98.

We first consider Lovitt's arguments pertaining to trial counsel's strategy and actions during the guilt phase of his trial. We find no merit in his contention that trial counsel were ineffective based on an alleged failure to conduct a reasonable investigation of the murder weapon. The circuit court found that trial counsel investigated whether the bloody scissors could have caused Dicks' wounds. The court's finding is supported by Rucker's testimony that he consulted a forensic expert at the Northern Virginia Forensic Laboratory, who opined that scissors of that approximate size could have caused the

wounds due to tissue compression at the time the wounds were inflicted. Based on this evidence, we conclude that counsel's investigation of the murder weapon was objectively reasonable. See Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Williams, 529 U.S. at 390-91.

Lovitt argues, nevertheless, that counsel were ineffective for failing to cross-examine the Commonwealth's witnesses concerning the "inconsistencies" between the stab wounds and the bloody scissors. We disagree because the record establishes that Rucker's investigation revealed that the wounds were not inconsistent with scissors of that approximate size. Therefore, Rucker had an objectively reasonable basis for failing to pursue this subject on cross-examination of the Commonwealth's witnesses. See Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Williams, 529 U.S. at 390-91.

We also hold that trial counsel did not render ineffective assistance by failing to object to certain DNA evidence and by failing to request further testing of the bloody scissors and Lovitt's jacket. Rucker testified that trial counsel purposefully adopted a strategy not to question the inconclusive DNA test results from the tests performed on these items. According to Rucker, this strategy permitted counsel to argue to the jury that the DNA tests failed to identify Lovitt as the

perpetrator of the crime, and that the Commonwealth had failed to bear its burden of proof on this issue. This strategy was objectively reasonable because it underscored the alleged deficiency in the Commonwealth's proof while avoiding the possibility that further testing of the scissors and jacket would yield results further implicating Lovitt in the murder. See Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Williams, 529 U.S. at 390-91.

Lovitt next argues that trial counsel were ineffective for failing to request a continuance to investigate Lucas' background after counsel learned that Lucas would be testifying on behalf of the Commonwealth. We find no merit in this contention because Wolfe interviewed Lucas before he testified and obtained information concerning his multiple felony convictions and his participation in the Evans prosecution for which he obtained the benefit of a plea bargain. Given this extensive impeachment evidence obtained by Wolfe in her interview of Lucas, we conclude that trial counsel's investigation of Lucas constituted an objectively reasonable exercise of professional judgment, and that a continuance was not needed for further investigation. See Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2535; Williams, 529 U.S. at 390-91.

Lovitt also argues that trial counsel were ineffective for failing to request a jury instruction regarding the "credibility of jailhouse informants." Citing a decision from another jurisdiction, Lovitt contends that he was entitled to an instruction stating that the testimony of an "informer" must be weighed with greater care than the testimony of an "ordinary" witness. See Dodd v. State, 993 P.2d 778, 784 (Okla. Crim. App. 2000). Lovitt's contention is without merit because the law of this Commonwealth does not require a fact finder to give different consideration to the testimony of a government informant than to the testimony of other witnesses. In addition, we observe that the jury at Lovitt's trial was properly instructed regarding its duty to determine the credibility of the witnesses. Therefore, we conclude that Lovitt has failed to prove that his counsel rendered ineffective assistance during the guilt phase of the trial.

We turn now to consider Lovitt's argument that trial counsel were ineffective in the penalty phase of the trial and that he suffered resulting prejudice. His contentions primarily address trial counsel's alleged failure to investigate his family background, which he asserts contained evidence of drug and sexual abuse, and counsel's failure to present more extensive evidence of his personal history to the jury.

Guided by Strickland, we directly consider the issue whether Lovitt suffered prejudice sufficient to undermine confidence in the outcome of his sentencing as a result of his counsel's failure to investigate and present certain mitigation evidence. See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542; Williams, 529 U.S. at 391. We focus our analysis on the Wiggins decision in which the Supreme Court, applying Strickland, recently invalidated a habeas petitioner's death sentence based on trial counsel's failure to investigate and present certain mitigation evidence to the jury at the petitioner's sentencing proceeding. Wiggins, 539 U.S. at ___, 123 S.Ct. at 2541-44.

In Wiggins, the petitioner was convicted of capital murder in a bifurcated proceeding. Id. at ___, 123 S.Ct. at 2532. During the penalty phase, trial counsel elected to present no mitigation evidence, instead seeking to prove that the evidence was insufficient to establish that the defendant was the actual perpetrator of the murder rather than a lesser participant in the crime. Id. at ___, 123 S.Ct. at 2532-33. Under Maryland law, this determination is made at the penalty phase of a capital murder trial, and a jury may impose the death penalty only if it determines that the defendant was the actual perpetrator of the offense. See Md. Code Ann., Crim. Law § 2-202 (2002).

Prior to adopting this approach, trial counsel had the defendant evaluated by a psychologist, who concluded that the defendant "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder." Wiggins, 539 U.S. ___, 123 S.Ct. at 2536. However, the psychologist's report did not describe or address the defendant's extensive personal history. Id. at ___, 123 S.Ct. at 2536. Trial counsel also reviewed court and social services records, which referred to the defendant's "misery as a youth" and to the fact that he had spent most of his childhood in foster care. Id. at ___, 123 S.Ct. at 2536.

At the habeas hearing in Wiggins, the petitioner presented evidence from a psychologist that petitioner "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother." Id. at ___, 123 S.Ct. at 2542. Evidence from the psychologist further indicated that the petitioner "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Id. at ___, 123 S.Ct. at 2542. In addition, the evidence showed that the petitioner was homeless for a period of time and had "diminished mental capacities." Id. at ___, 123 S.Ct. at 2542.

The Supreme Court held that trial counsel's decision to limit their investigation of mitigation evidence was

51

unreasonable, because the evidence counsel had seen in the social services records would have led a reasonably competent attorney to conduct a further investigation.  Id. at ___, 123 S.Ct. at 2541-42.  The Court concluded that the petitioner was prejudiced by counsel's unprofessional errors of judgment because the mitigating evidence that counsel failed to discover and present was "powerful."  Id. at ___, 123 S.Ct. at 2542.  In reaching this conclusion, the Court also observed that the petitioner's social history contained "little of the double edge we have found to justify limited investigations in other cases."  Id. at ___, 123 S.Ct. at 2542.

Unlike the record in Wiggins, the record from Lovitt's trial shows that counsel presented some recent personal history as mitigation evidence at the penalty phase of the trial.  That evidence, provided by four sheriff's deputies working at the Arlington jail, showed that Lovitt had made a very good adjustment to his incarceration and had participated in Bible study, in Alcoholics Anonymous meetings, and in voluntary work programs.

In addition, trial counsel presented some family history evidence through the testimony of Lamanda Jones, Lovitt's stepsister, who testified about the help that Lovitt had provided to his younger siblings in various aspects of their upbringing.  She stated that Lovitt helped take care of the

other children because his stepfather was an alcoholic and "wasn't allowed around us most of the time." According to Jones, Lovitt regularly fed the younger children and helped them get ready for school. Jones also testified that, as an adult, Lovitt visited her children every weekend and that she trusted him to be with them.

At the habeas hearing, the evidence of Lovitt's family and social history consisted of testimony from family members and various records from the courts, social services, and juvenile corrections. Lovitt did not present testimony from a psychologist or a psychiatrist concerning his family history and any effect that such history may have had on his development.

The testimony of Lovitt's family members at the habeas hearing consisted of mostly general statements concerning abuse directed toward Lovitt by his stepfather. Sherry Taylor, Lovitt's cousin, testified that Lovitt's stepfather was "very abusive" toward Lovitt and the other children. However, Taylor did not describe any abuse specifically directed at Lovitt, other than the fact that the stepfather "curs[ed] [Lovitt] out . . . all the time."

Taylor also testified regarding Lovitt's good qualities, stating that he was very protective of his siblings, helpful, and "good with kids." She further stated that all the children in the family loved him.

Lamanda Jones testified that Lovitt's stepfather abused alcohol and drugs, and that she had observed him "beat" Lovitt with a telephone cord on a frequent basis. Jones also stated that Lovitt's stepfather "molested" all the children, and that such abuse was a "regular occurrence." However, Jones did not relate any particular type or instance of sexual abuse directed at Lovitt, and her only specific testimony regarding sexual abuse concerned some of the other children.

Addressing Lovitt's good qualities, Jones stated that Lovitt tried to protect his younger siblings from their father's abuse. She also indicated that Lovitt was a "father figure" to her during her childhood, and stated that he was "like [a] father" to her own children.

Tonjala Carter, another stepsister, testified that Lovitt's stepfather abused alcohol and drugs and was very violent toward Lovitt. However, her testimony concerning such violence was limited to a general description that the stepfather was "always hitting on him, always cursing at him," and was very "mean."

Carter also related that Lovitt had good qualities as a brother and an uncle. She stated that he often tried to protect the younger siblings from their father and was a "father figure" to them in several of the aspects of their daily life. Carter also testified that Lovitt was "[v]ery good" with his nieces and nephews.

The various records introduced at the habeas hearing were equivocal in some respects and could have been viewed by a jury as either evidence in aggravation or in mitigation of the offense. For example, Lovitt's substance abuse and medical records showed that Lovitt had an antisocial personality disorder and "polysubstance" dependence. The records stated that Lovitt began drinking alcohol, supplied by his stepfather, at the age of five, and began using marijuana at the age of eight.

These records also showed that Lovitt abused many different types of drugs as an adult, including heroin, amphetamines, "acid," and phencyclidine. The records described Lovitt as having a "serious problem with his anger" and having "[d]ifficulty in respecting others." Also, in some of these records, Lovitt described his family as "growing up close" and stated that he "had everything he needed."

In his juvenile court records, Lovitt's childhood home was described by a caseworker as being "very clean and nicely furnished," and his mother and stepfather were described as "strong individuals" who provided Lovitt with "a stable home life." Lovitt's childhood home was further described by a caseworker "as being well-maintained and adequate for the family's needs." In addition, a clinical assessment contained in the juvenile records stated that Lovitt did not relate any

problems with his family and "reported no difficulties in the relationship with his stepfather." However, other juvenile records showed that Lovitt described his stepfather as a "heavy drinker [who] would sometimes become abusive toward his wife and children."

The juvenile records also contained references to Lovitt's lack of remorse for his behavior, lack of empathy for others, lack of respect for the law, and propensity to blame others for trouble that he instigated. These records also described Lovitt as being "physically aggressive" and "manipulative," and as having assaulted other juveniles at the Beaumont Correctional Center.

In determining prejudice, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542; see also Williams, 529 U.S. at 397-98. The evidence in aggravation included the brutal nature of the attack on Dicks, and the fact that Lovitt murdered Dicks solely to eliminate any witness to the robbery. Lovitt's prior record contained numerous felonies including attempted robbery, several burglaries and larcenies, and drug violations. While incarcerated for some of these crimes, Lovitt was charged with many disciplinary violations, which included assault, manufacturing "shank handles," and

possession of cocaine.  He was on parole at the time he murdered Dicks.

The mitigation evidence concerning Lovitt's home life as a child is mixed, with some evidence from his juvenile records suggesting that the situation might not have been as difficult as the testimony at the habeas hearing indicated.  In addition, there is no evidence describing the nature or extent of sexual abuse allegedly inflicted on Lovitt by his stepfather.  Without such evidence, this Court would have to resort to speculation to consider any sexual abuse that Lovitt may have suffered.

The evidence regarding Lovitt's stepfather's other actions toward him is somewhat general in nature.  Nevertheless, the evidence in mitigation at the habeas hearing contained information about Lovitt's stepfather having provided Lovitt alcohol at an early age and having hit him repeatedly with a telephone cord and cursing him.

The evidence in mitigation also included descriptions of Lovitt helping to take care of his siblings to compensate for Lovitt's alcoholic stepfather's failure to assume this role. However, the jury was informed of this fact, although in less detail, when Lamanda Jones testified at the penalty phase proceeding.  There also was evidence in mitigation, which was not presented by trial counsel, that Lovitt helped protect his younger siblings from abuse by their father.

The evidence concerning Lovitt's extensive drug abuse and antisocial personality disorder is evidence of a type that the Court in Wiggins termed "double edge." See Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542. As such, this evidence could be viewed both in aggravation and in mitigation of the offense. See Burger, 483 U.S. at 793-94; Darden, 477 U.S. at 186-87. Lovitt's juvenile and other records also are evidence reflecting a "double edge," and show that he began a cycle of crime and aggressive behavior at an early age and continued this pattern throughout his adult life, despite the many occasions he was offered assistance to resolve his problems.

We also observe that there is no evidence in the record from a psychologist or a psychiatrist providing an evaluation of Lovitt's mental health. Thus, there is no evidence directly addressing the effect Lovitt's family life may have had on his development. The absence of such evidence represents a failure of proof regarding Lovitt's contention that he was prejudiced by trial counsel's failure to present extensive evidence of his family and social history at the penalty phase proceeding.

In addition, there is no evidence in the record that Lovitt has a diminished mental capacity. This aspect of the case represents a major distinction from the evidence presented in Wiggins, which showed that the petitioner exhibited "borderline retardation." Wiggins, 539 U.S. at ___, 123 S.Ct. at 2533.

The evidence in Wiggins also showed that the petitioner had no prior convictions.  Id. at ___, 123 S.Ct. at 2543.  By contrast, as indicated above, Lovitt's prior record depicts a person who, in essence, was a "career criminal" unaffected by the many attempts to offer him rehabilitative services.

Upon reviewing the evidence in aggravation and in mitigation of the offense presented at the penalty phase of the trial and at the habeas hearing, we conclude that Lovitt has failed to demonstrate that his defense was prejudiced by trial counsel's failure to investigate and present the available mitigation evidence.  Based on all the evidence before us, we hold that the record fails to show that, but for his trial counsel's stated failures, there is a reasonable probability that the result of the proceedings would have been different.  See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542; Williams, 529 U.S. at 391.  In short, the record before us does not undermine confidence in the outcome of the proceedings.  See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542; Williams, 529 U.S. at 391.

Our conclusion in this regard is not altered by the Supreme Court's decision in Williams.  There, the Court concluded that a defendant had suffered prejudice resulting from his counsel's failure to present substantial available mitigation evidence at

59

the penalty phase of his capital murder trial.  Williams, 529 U.S. at 396.

The available mitigation evidence that was not presented in Williams showed that the petitioner had suffered extreme abuse and neglect in his early childhood years.  Id. at 395.  The evidence indicated that the petitioner's parents both had been imprisoned for criminally neglecting the petitioner, "that Williams had been severely and repeatedly beaten by his father, [and] that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home)."  Id.  In addition, the evidence available, but not presented, in Williams indicated that the petitioner was "'borderline mentally retarded' and did not advance beyond sixth grade in school." Id. at 396.

In contrast, the record before us does not contain extensive evidence of abuse that Lovitt suffered as a child. Nor does the evidence suggest that he has a diminished mental capacity.  In fact, Lovitt obtained a high school equivalency diploma, commonly known as a G.E.D. degree, as an adult.  Thus, the evidence before us does not raise the same concerns that the Supreme Court in Williams held "might well have influenced the jury's appraisal of [the petitioner's] moral culpability."  Id. at 398.

Finally, we observe that in reaching its conclusion in Williams that the petitioner suffered prejudice as a result of his counsel's errors, the Supreme Court also observed that trial counsel did not introduce evidence from certain witnesses who were not related to the petitioner and were available to testify. Id. at 396. The Court observed that a certified public accountant, who had visited Williams frequently as part of a prison ministry program, had been available to testify that Williams appeared to thrive in the structured environment of prison and had earned a carpentry degree while incarcerated. Id. The Court also stated that certain prison officials would have testified that, in their opinion, Williams was not likely to act in a dangerous or violent manner while incarcerated. Id.

At Lovitt's trial, however, the jury did hear testimony regarding his good adjustment to prison life while awaiting trial. As we have already noted, four correctional officers testified to this effect at the penalty phase proceeding. Thus, for all the above reasons, we conclude that the nature and amount of mitigation evidence that was proved to be available, but not presented, in Lovitt's case is materially different from the available mitigation evidence not presented in Williams.

We also find no merit in Lovitt's claim that the judge at the habeas hearing improperly excluded certain affidavits by several of Lovitt's family members that Lovitt attempted to

introduce into evidence.  Assuming, without deciding, that such affidavits are admissible subject to the trial court's discretion in an evidentiary hearing held under Code § 8.01-654(C), we conclude that the circuit court did not abuse its discretion in refusing to admit them into evidence.  The facts alleged in those affidavits were cumulative of the testimony of Taylor, Jones, and Carter.

Lovitt also is incorrect in his assertion that the affidavits at issue would have been admissible in the penalty phase proceeding and, thus, should have been admitted into evidence on that basis at the habeas hearing.  Unlike some other jurisdictions, Virginia does not permit the admission of such hearsay evidence during penalty phase proceedings.  See Code § 19.2-264.4(B).

We do not consider in this habeas corpus proceeding Lovitt's claim that he is actually innocent.  This issue was resolved by the jury in his trial on the capital murder and robbery charges.  As stated above, we affirmed the judgment of the circuit court, and the United States Supreme Court denied Lovitt's petition for a writ of certiorari challenging those convictions.  We also observe that an assertion of actual innocence is outside the scope of habeas corpus review, which concerns only the legality of the petitioner's detention.  See Wilkins, 255 Va. at 420-21, 498 S.E.2d at 696; McClenny, 246 Va.

at 134-35, 431 S.E.2d at 331; Smyth, 199 Va. at 96-97, 97 S.E.2d at 748.

Finally, we have reviewed Lovitt's remaining allegations and conclude that they have no merit.

For these reasons, we will dismiss the petition for a writ of habeas corpus.

Petition dismissed.