COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Chief Judge Decker, Judges Huff and Callins
Argued by videoconference


ALONZO ROGER JACKSON
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0437-22-2                      JUDGE GLEN A. HUFF
                                                    APRIL 25, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF AMELIA COUNTY
Joseph M. Teefey, Jr., Judge

M.G. Henkle (Henkle Law Firm, on brief), for appellant.

Lucille M. Wall, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Alonzo Roger Jackson appeals his conviction for distributing a Schedule II controlled

substance, second or subsequent offense, in violation of Code § 18.2-248, raising multiple

assignments of error.  For the reasons that follow, this Court affirms his conviction.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party [below]."  *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  Under

that standard, this Court "discard[s] the evidence of the accused in conflict with that of the

Commonwealth, and regard[s] as true all the credible evidence favorable to the Commonwealth

and all fair inferences to be drawn [from that evidence]."  *Bagley v. Commonwealth*, 73 Va. App.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413.

1, 26 (2021) (third alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

In June 2020, a grand jury indicted Jackson for distributing a Schedule II controlled substance, second or subsequent offense. Before trial, Jackson objected to the Commonwealth entering into evidence an unredacted copy of a 2002 conviction and sentencing order indicating that Alonzo Roger Jackson, born August 6, 1972,[1] had pleaded guilty in the Circuit Court of Amelia County (the "trial court") to two counts of distribution of cocaine, third or subsequent offense, in violation of Code § 18.2-248. The order further indicated that three additional charges of cocaine distribution were nolle prosequied on the Commonwealth's motion. Jackson argued that the trial court should redact the order to exclude reference to the nolle prosequied charges. The trial court denied Jackson's motion, ruling that it was "not going to redact a record of the court."

During voir dire, Juror 10 stated that she knew Jackson because she "know[s] a lot of people in Amelia County." She said she "never spent time with" Jackson and further explained, "I know his wife more than I know him. I don't spend time with her either, but I know her." Despite this, she maintained that her knowledge of Jackson would not impact her ability to judge the case fairly and impartially. She further stated that she had read about the case in the newspaper but did not remember any of the details and had not formed an opinion about the case. Jackson did not question Juror 10 any further, nor did he move to strike Juror 10 for cause[2] or use a peremptory strike to remove her from the jury. After Juror 10 was selected to sit on the jury, Jackson informed the trial court that he was satisfied with the jury composition.

---

[1] Case records uniformly list Jackson's birth date as August 6, 1972.

[2] Jackson moved to strike another juror for cause, which the trial court granted.

Michael Holmes testified that he acted as a confidential informant for law enforcement for approximately two years and typically received $140 as compensation for each controlled buy of drugs. In March 2020, Holmes contacted law enforcement and "volunteer[ed]" to buy drugs from Jackson, from whom Holmes had purchased drugs previously. Holmes met with Amelia County Sheriff's Deputy R.W. Dunford to arrange the controlled buy. Deputy Dunford searched Holmes for drugs and gave him a cell phone with video and audio recording capability, $250 to buy drugs from Jackson, and Holmes's $140 compensation. Amelia County Sheriff's Investigators Philip Siegle and William Edwards searched Holmes's vehicle for drugs. The police did not find drugs on Holmes's person or in his car before he met with Jackson.

Holmes called Jackson and told him that he "needed to get street" or "a split," by which he meant half an eight-ball of crack cocaine. When Jackson agreed, Holmes drove to Jackson's house with Deputy Dunford following him in another vehicle.

Holmes recorded his subsequent interaction with Jackson, and the Commonwealth played the video during Holmes's trial testimony.[3] Although the video is shaky and difficult to hear at times, it shows Holmes driving to a house where he was greeted by two individuals, one of whom he later identified as Jackson. Jackson went inside and returned a few minutes later with a baggie containing a white substance that he handed to Holmes. Holmes identified the substance at trial as crack cocaine. During the transaction, Jackson asked Holmes, "[W]hy you gotta get it broke up like that? . . . You're going to smoke it all anyway."

Holmes gave the baggie to Deputy Dunford, who transported it to the Department of Forensic Science. The substance inside tested positive for cocaine.

---

[3] Holmes fell asleep while the Commonwealth played the video but testified that he had seen the video before.

Approximately seven months later, in October 2020, Holmes sent text messages to Deputy Dunford stating:

> Yes sir I haven't been quite honest with you them buys we did on Jackson the other bald head guy that was there every time we did a buy he gave me the drugs I gave him the money I'm sorry but Jackson didn't sell me anything he was around but never handed me anything the other bald head guy did[.]
>
> And I'm being honest with you no one forced me to say this it's been eat[ing] my con[science] up[.]

Holmes also called Jackson's counsel to explain that the "other bald head guy" was "Slim," also known as Roy Wilson.[4]  At trial, Holmes explained that he sent the messages to Deputy Dunford and called Jackson's counsel—alleging Wilson, rather than Jackson, was the dealer—because someone was threatening to kill him or hurt him.[5]  He further testified that unidentified people followed him around and "shot up" his car, causing him to move out of town for several months. He insisted that the messages were untrue and that he had, in fact, bought drugs from Jackson in March 2020, not from Wilson.  Deputy Dunford, who knew Wilson, testified that Wilson was not the man in the video of Holmes's transaction with Jackson.

Holmes admitted that he had three prior felony convictions for drug offenses.  At the time of trial, he also had pending charges in Amelia County for domestic assault and failure to appear, as well as four pending charges in Nottoway County, including charges of forgery of a public record and uttering a forged public record.

When Holmes was asked during cross-examination who would determine whether he would "get any consideration" in his pending Amelia County charges in return for his testimony

---

[4] Wilson has since passed away.

[5] Holmes did not specify who was threatening him.  Jackson was not charged with making threats.

against Jackson, Holmes responded, "The Judge decide." After additional questioning on this subject, the trial court interjected, "Well, let's be clear here. There is only one person who makes that decision, and that's one who is sitting in this position. . . . So it's not [the] Commonwealth. It's not anybody else. It's the Court that ultimately will make that decision." Jackson did not object to the trial court's comments at that time. When the trial court questioned the relevance of the inquiry, Jackson's counsel moved on and questioned Holmes about the prosecutor's authority to decide to pursue charges.

At the conclusion of the Commonwealth's case, Jackson made a motion to strike, arguing primarily that Holmes's testimony was not credible. The trial court ruled that Holmes's credibility was a factual issue to be decided by the jury and denied the motion to strike. Jackson did not submit any evidence and renewed his motion to strike, which the trial court again denied.

Jury Instruction A, proposed by Jackson, stated:

> The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected by interest or by prejudice against a defendant.

The Commonwealth objected, arguing that the instruction did not accurately state Virginia law. Jackson conceded that he knew of no Virginia cases supporting the instruction but directed the trial court to *United States v. Luck*, 611 F.3d 183 (4th Cir. 2010). The court found that, unlike Holmes's testimony, the informant's testimony in *Luck* was uncorroborated and *Luck* was therefore inapplicable. Accordingly, the trial court rejected Jury Instruction A but instructed the jury that it should consider each witness's credibility, including each witness's "interest in the outcome of the case" and "their bias."

The jury found Jackson guilty in July 2021. In October 2021, the parties appeared for sentencing but agreed to continue the case because the sentencing hearing had been set before a different judge than the judge who had presided at trial. In November 2021, Jackson, who was indigent, moved for the preparation of a trial transcript at state expense so that he could prepare a motion to set aside the jury verdict, "based in part on allegations of juror misconduct but also upon sufficiency of the evidence."[6] The parties convened again for sentencing in December 2021, approximately four months after trial. Jackson argued that he needed the trial transcript to prepare his motion to set aside the verdict and that there were "a number of arguments that [he] would like to bring before the Court."

The trial court denied the motion. First, the court found that Jackson already had an opportunity to challenge the sufficiency of the evidence in making his motion to strike, that Jackson had not demonstrated that the passage of time had frustrated defense counsel's ability to recall the facts of trial,[7] and that counsel could have drafted the motion to set aside the verdict immediately following trial. Second, the trial court found that potential juror misconduct would not be reflected in the transcript because such misconduct would have happened off the record. The court thus concluded that Jackson had not demonstrated a need for the trial transcript.

After the court denied his motion for a transcript, Jackson's counsel informed the court that he was not ready to proceed with sentencing as scheduled because he still wished to file a motion to set aside the verdict; in addition, believing the trial court would grant the motion for transcripts, he had informed three of his sentencing witnesses that they did not need to appear for

---

[6] Although in his motion for a transcript Jackson then described his claim as one of juror "misconduct," he later began referring to the claim as one of juror bias. *Infra* p. 7. On appeal, he has continued to frame the issue as one of juror bias, and this Court agrees. *Infra* p. 19.

[7] The same counsel represented Jackson at trial and at sentencing.

the hearing. Jackson therefore requested a continuance, which the Commonwealth opposed. The trial court denied a continuance, noting that (1) Jackson could file a motion to set aside the verdict after the court entered the sentencing order, and (2) the court had subpoenaed Jackson's witnesses to testify at the sentencing hearing, so Jackson's decision to dismiss those witnesses was therefore a problem of his own making. Jackson did not request to proffer the testimony of the missing witnesses. After Jackson's wife and uncle-in-law testified to Jackson's good character, the trial court sentenced Jackson to ten years' imprisonment with four years and three months suspended.

Jackson subsequently filed motions to reconsider the denial of the continuance, to stay the final sentencing order, and to set aside the verdict. Jackson proffered the missing witnesses' testimony in his motion to reconsider; generally, they would have testified to Jackson's good character. Jackson argued that the verdict should be set aside because the court erred in admitting an unredacted copy of his previous conviction order and the evidence was insufficient to support the conviction because Holmes was not a credible witness.

Jackson also fleshed out his allegation of "juror misconduct" from his motion for a transcript—which he began describing as an allegation of "juror bias" in his new motion to set aside the verdict. He asserted that Juror 10, who ultimately served on the jury, had a conversation with Jackson's wife, Monica, in 2013 in which Juror 10 made comments about Jackson's previous infidelity to his wife. Jackson appended to the motion an affidavit from Monica attesting to Juror 10's 2013 comments, which stated:

> 3. My family, including my husband, and I have known [Juror 10] for many years, including during a time when my husband was unfaithful to me around 2013;

- 7 -

4. During this period of infidelity, she stopped me in Food Lion in Amelia to ask whether the daughter produced by the other party during the infidelity was in fact my husband's child and to suggest that my husband and I use condoms;

5. I believe part of her interest in our situation stemmed from her own past experiences with an unfaithful husband, who had produced a daughter outside their marriage, and was later beaten up and killed;

6. [Juror 10] also inquired whether the woman with whom my husband was unfaithful ever approached me in public or otherwise bothered me, as had happened to her;

7. Overall, she gave me the impression of being strongly against any man who had ever been unfaithful to his spouse;

8. My husband's trial was on July 27, 2021, and I saw [Juror 10] in 7-11 in Amelia about 2 days later, where she approached me stating, "Monica, I'm so sorry." She stated that people in the community were asking her why she was on the jury, and she added that she was currently working as a dispatcher in Powhatan.

Juror 10 did not mention the 2013 conversation with Monica in her answers to voir dire questioning, and defense counsel attested that he did not learn of it until after trial.

The trial court initially scheduled a hearing on the motions, but after defense counsel fell ill and instead requested a remote hearing,[8] the court cancelled the hearing and denied the motions on the pleadings by order dated December 29, 2021. Specifically, the court explained that Jackson did not request to proffer testimony at the sentencing hearing while a court reporter was present, did not raise an objection to the jury selection process at trial, and did not establish any jury bias or any other basis that would justify setting aside the verdict. This appeal followed.

---

[8] Defense counsel filed written objections to the court's ruling asserting that he had requested, and the trial court had initially granted, a remote hearing.

ANALYSIS

I. Admission of 2002 Order

Jackson first argues that the trial court erred in admitting an unredacted copy of his 2002 conviction and sentencing order. Specifically, he argues that admission of the sentencing order was improper because (1) the Commonwealth did not establish that Jackson was the person named in the order, and (2) the order referenced charges that had been nolle prosequied.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022) (citing *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). Relevant evidence is "evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. Generally, evidence must be relevant to be admissible. Va. R. Evid. 2:402.

Because the Commonwealth charged Jackson with distributing a Schedule II controlled substance, second or subsequent offense, it was required to prove that Jackson had a prior similar conviction. *See McBride v. Commonwealth*, 75 Va. App. 556, 575 n.9 (2022) ("We have long held that '[c]onviction of a prior like offense is an element of the charge as it was set forth in the indictment.'" (alteration in original) (quoting *Berry v. Commonwealth*, 22 Va. App. 209, 213 (1996))). The Commonwealth sought to do so here by entering a 2002 conviction and sentencing order from the same jurisdiction involving a defendant with the same name and birth date as Jackson.

- 9 -

"Identity of names carries with it a presumption of identity of person, the strength of which will vary according to the circumstances." *Holmes v. Commonwealth*, 41 Va. App. 690, 692 (2003) (quoting *Cook v. Commonwealth*, 7 Va. App. 225, 230 (1988)). This is a presumption "in the sense that it is a permissible inference." *Id.* Jackson never attempted to rebut this permissible inference. Accordingly, the trial court did not err in admitting the order and allowing the jury to determine if Jackson was the same Alonzo Roger Jackson named in the 2002 order.

Jackson also argues the court should have redacted the references to the nolle prosequied charges in the 2002 order because their mention was prejudicial. Assuming the trial court did err in refusing to redact the order, such error was harmless. "In Virginia, non-constitutional error is harmless 'when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Brown v. Commonwealth*, 68 Va. App. 746, 794 (2018) (quoting *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1009 (1991) (en banc)). Accordingly, the reviewing court must look to whether "the judgment was . . . substantially swayed by the error." *Clay v. Commonwealth*, 262 Va. 253, 260 (2001) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (2001)). If the "error did not influence the jury, or had but slight effect, the verdict and the judgment should stand." *Id.* (quoting *Kotteakos*, 328 U.S. at 764).

The 2002 order listed five charges of distribution of cocaine; three of those are listed as nolle prosequied at the request of the Commonwealth. The three nolle prosequied charges are all listed as occurring on days different from the two charges of which Jackson was convicted. A jury reading the order could differentiate the allegations and understand that Jackson was convicted of only two of the charges—indeed, the order explicitly says so when reciting the sentence. Moreover, even if the trial court redacted mention of the three nolle prosequied

distribution charges, the order would still show that Jackson was convicted of two other identical distribution charges. Given these considerations, this Court cannot conclude that mentions of the nolle prosequied charges on the unredacted order "substantially swayed" or had more than a "slight effect" on the jury's verdict. *See id.* (quoting *Kotteakos*, 328 U.S. at 764-65).

## II. The Trial Court's Allegedly Prejudicial Statement

Jackson next assigns error to the trial court's statement that it, and not the Commonwealth, would decide whether Holmes received consideration for testifying. Jackson concedes that he did not object to the court's statement but asks this Court to invoke the ends of justice exception to Rule 5A:18. This Court declines to do so.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to . . . attain the ends of justice." Rule 5A:18; *see also Mollenhauer v. Commonwealth*, 73 Va. App. 318, 329-30 (2021) ("[T]he *precise* nature of the objection must be clear because '[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review.'" (second and third alterations in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011))). "'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Conley v. Commonwealth*, 74 Va. App. 658, 682 (2022) (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc)). "Whether to apply the ends of justice exception involves two questions: '(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice.'" *Id.* at 682-83 (quoting *Commonwealth v. Bass*, 292 Va. 19, 27 (2016)). "The burden of establishing manifest injustice is a heavy one, and it rests with the appellant[,] . . . [who] must

- 11 -

affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* at 683 (quoting *Holt*, 66 Va. App. at 210).

Jackson has not made the requisite showing. His assertion that the trial court limited his cross-examination of Holmes's motives for testifying is unsupported by the record. Holmes answered Jackson's question about who would decide if he would receive a benefit from his testimony. And when the court expressed doubt as to the relevance of whether Holmes expected a benefit from the court or from the Commonwealth, Jackson voluntarily moved on to ask Holmes different questions about his potential bias. Moreover, Jackson has made no showing that the court's statement influenced the jury's verdict. Accordingly, the ends of justice exception does not excuse Jackson's failure to preserve this argument.

### III. Jury Instruction A

Jackson next argues that the trial court erred in rejecting proposed Jury Instruction A. "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial court.'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 228 (2021) (alteration in original) (quoting *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017)). "An appellate court 'review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (alteration in original) (quoting *Watson v. Commonwealth*, 298 Va. 197, 207 (2019)). "[W]hether an instruction 'accurately states the relevant law'" is a question of law reviewed de novo on appeal. *Id.* (quoting *Ducharme v. Commonwealth*, 70 Va. App. 668, 674 (2019)).

In *United States v. Luck*, the Fourth Circuit Court of Appeals held that defense counsel provided constitutionally ineffective assistance by failing to propose a jury instruction identical to Jury Instruction A. 611 F.3d at 186-90. The Virginia Supreme Court, however, has rejected the similar claim that defense counsel provided ineffective assistance by failing to request "an

- 12 -

instruction stating that the testimony of an 'informer' must be weighed with greater care than the testimony of an 'ordinary' witness." *See Lovitt v. Warden*, 266 Va. 216, 252 (2003). In doing so, the Supreme Court stated unequivocally that "the law of this Commonwealth does not require a fact finder to give different consideration to the testimony of a government informant than to the testimony of other witnesses." *Id.* Jackson makes no attempt to distinguish *Lovitt*, which indicates that Jury Instruction A incorrectly states Virginia law. Because *Lovitt* is binding upon this Court, and *Luck* is not, the trial court did not err in refusing Jury Instruction A.[9]

## IV. Sufficiency of the Evidence

Jackson next challenges the sufficiency of the evidence supporting his conviction, primarily by asserting Holmes's testimony was incredible. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

---

[9] Other jurisdictions are split regarding the proposed instruction. *Compare, e.g.*, *State v. Arroyo*, 973 A.2d 1254, 1262 (Conn. 2009) (holding that "the trial court should instruct the jury that the informant's testimony must 'be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness'" (alteration in original) (quoting *State v. Patterson*, 886 A.2d 777, 788 (Conn. 2005))), *with Stopher v. Commonwealth*, 57 S.W.3d 787, 804 (Ky. 2001) (finding no authority "for the proposition that the trial court was required to instruct on a jailhouse informant's benefit from testifying"). Notwithstanding this split in authority, this Court remains bound by the Supreme Court of Virginia.

"[D]etermining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "[W]e may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Jackson argues that Holmes's testimony was not credible and therefore left reasonable doubt as to whether Jackson or Wilson sold Holmes the cocaine. "At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). On appeal, this Court reviews the trier of fact's determination regarding the identity of the criminal actor in the context of "the totality of the circumstances." *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 249 (1992)).

Here, Holmes's testimony was not inherently incredible. Although Holmes said in the October 2022 text message to Deputy Dunford and phone call to Jackson's counsel that

Wilson—not Jackson—sold him the cocaine, he explained that he said so under duress. As fact finder, the jury was entitled to believe or disbelieve that explanation. Holmes's identification of Jackson was corroborated by Deputy Dunford, who identified Jackson in the video and verified that Wilson, whom he knew, was not in the video. Finally, the jury had the opportunity to observe Jackson in the courtroom, watch the video, and draw their own conclusions as to whether Jackson was the man on the video.[10] Using this evidence, a reasonable finder of fact could identify Jackson as the perpetrator and conclude beyond a reasonable doubt that he was guilty of the charged offense.

## V. Proffer of Character Witnesses

Next, Jackson argues that the trial court erred in "refus[ing] to permit defense counsel to proffer the testimony of [unavailable character] witnesses." However, as the trial court noted in its order denying Jackson's December 2021 motions, Jackson did not request to proffer such testimony at the sentencing hearing. Accordingly, to the extent Jackson's argument focuses on the sentencing hearing, it is waived. *See* Rule 5A:18. Jackson has not invoked Rule 5A:18's exceptions, and this Court will not apply them sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

Moreover, Jackson *did* proffer the witnesses' testimony in a later written motion. The extent to which the trial court considered Jackson's written proffer is unclear from the court's order, but Jackson's assignment of error relates to the importance of a proffer in allowing *this Court* to consider the import of any refused evidence. Jackson does not argue that his written

---

[10] Jackson also asserts that the police "did not thoroughly search [Holmes's] vehicle," suggesting that Holmes may have had the cocaine before meeting with Jackson. This is pure speculation. In addition, the jury could conclude from the video, which depicts Jackson handing Holmes a baggie containing a white substance and commenting that Holmes was "going to smoke it all," that Holmes received the cocaine from Jackson.

proffer is insufficient for purposes of appellate review, and the trial court did not err in declining to convene a new hearing so that Jackson could proffer the testimony before a court reporter.

## VI.  Denial of Transcript

Jackson next challenges the trial court's denial of his motion for a trial transcript.  "Under equal protection principles, an indigent defendant must be provided with the basic tools of an adequate defense," including "a transcript of prior proceedings when that transcript is needed for an effective defense." *Asfaw v. Commonwealth*, 56 Va. App. 158, 163 (2010) (quoting *Anderson v. Commonwealth*, 19 Va. App. 208, 211 (1994)).  When determining whether an indigent defendant has demonstrated a need for a transcript, courts primarily focus on "the strategic 'value' the transcript provides to the defense, and the 'availability of alternative devices that would fulfill the same functions as a transcript.'" *Id.* (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)).  "The failure to provide an indigent with a transcript implicates the constitutional harmless-error standard which requires a reviewing court to be 'able to declare a belief that it was harmless beyond a reasonable doubt.'" *Id.* at 165-66 (quoting *White v. Commonwealth*, 21 Va. App. 710, 716 (1996)).

Jackson argued below that the trial transcript would have supported a motion to set aside the verdict because it would show that the evidence was insufficient to convict and that his trial was tainted by jury misconduct.  Jackson presented the sufficiency argument to this Court on appeal with the benefit of the full transcript, and this Court finds that argument unpersuasive, as noted above.  Furthermore, Jackson has shown no reason to believe that the trial court would have reached a different conclusion than when it denied Jackson's motion to strike and renewed motion to strike, made when the evidence was fresh in the minds of the trial court and defense counsel.

Additionally, the trial transcript reveals that the trial court correctly concluded that any potential juror misconduct would not be shown in the transcript. In his motion to set aside the verdict, Jackson asserted without the benefit of the transcript that Juror 10 "admitted knowing the defendant through his wife but misstated under oath her impartiality." Now in possession of the full transcript, Jackson points to no additional information concerning Juror 10, and this Court sees none. Jackson based his juror misconduct argument on information he claims to have received post-trial about a conversation Juror 10 had with Jackson's wife in 2013. That information is not in the trial transcript, nor does the transcript show the effect of any potential juror bias because juror deliberations are not conducted on the record. Accordingly, because Jackson has not shown that the denial of a transcript prejudiced his defense, this Court will not disturb the trial court's ruling.

VII. Denial of Hearing and Motion to Set Aside

Jackson next argues that the trial court erred in both denying his motion to set aside the verdict on the merits[11] and in failing to conduct an evidentiary hearing on the claim of juror bias contained therein. He specifically contends that Juror 10 misrepresented her impartiality under oath during voir dire because she minimized the extent to which she knew Jackson and how that prior knowledge affected her opinion of him.

In support of that claim, Jackson presented the trial court with an affidavit from his wife, Monica, in which she attested to a conversation she had with Juror 10 in 2013 about Jackson's

---

[11] This opinion addresses the issues related to the merits of Jackson's motion in the other subsections of the analysis.

- 17 -

previous infidelity.[12]  Jackson asserts that this conversation alone, despite being nearly a decade

old at the time of trial, demonstrates that Juror 10 "held a poor opinion of Jackson's character"

and thus secretly harbored bias towards him.[13]  As a result, Jackson argues, Juror 10 could not

consider the evidence and render a verdict impartially, contrary to her answers during voir dire.

He insists that, at a minimum, the trial court "should have held a hearing to determine whether

[Juror 10] was, in fact, the impartial juror she represented herself to be."  Under the facts

presented here, the trial court did not abuse its discretion in resolving this issue without first

conducting a hearing.[14]

Before the trial court is required to hold a hearing on alleged juror bias for an

already-seated juror, "the trial court should consider the totality of the circumstances and

determine whether a party presented credible allegations of bias that undermine the prior

determination of impartiality reached by the trial court at the conclusion of the *voir dire*

process."  *Nelson v. Commonwealth*, 41 Va. App. 716, 733 (2003).  This Court reviews that

determination for abuse of discretion.  *See id.* at 731-32 (citing *Green v. Commonwealth*, 26

Va. App. 394, 401 (1998)); *see also David v. Commonwealth*, 26 Va. App. 77, 81 (1997)

(holding that the question of juror impartiality is a factual determination that "will not be

---

[12] In her affidavit, Monica also stated that she had a post-trial conversation with Juror 10, in which Juror 10 apologized to Monica.  Because Jackson provided no additional context for that statement, this Court finds no basis for concluding that the expression of Juror 10's condolences, after having convicted Monica's husband of criminal charges, shows bias against Jackson, particularly where defense counsel knew about the relationship between Juror 10 and Jackson's wife during voir dire.

[13] Jackson maintains that this information was unavailable during voir dire and only came to light after Jackson's conviction and subsequent sentencing hearing.

[14] That the trial court initially scheduled and subsequently cancelled a hearing on Jackson's motion does not affect this Court's analysis.

disturbed on appeal absent 'manifest error'" (quoting *Stewart v. Commonwealth*, 245 Va. 222, 234, *cert. denied*, 510 U.S. 848 (1993))).

For example, in *Nelson*, this Court held that the trial court did not abuse its discretion in refusing to question a juror mid-trial upon learning that the juror knew the defendant's mother. 41 Va. App. at 729, 733. There, Nelson's claim "d[id] not involve allegations of juror misconduct" and merely "involve[d] a series of speculative links." *Id.* at 730.

Jackson's post-verdict claim is likewise one of juror bias—not misconduct.[15] Under the totality of the circumstances here, the trial court reasonably concluded the allegation of bias was too "speculative" to be "credible." *Id.* at 730, 733. Monica's affidavit[16] contains no outright criticism of Jackson from Juror 10 during their alleged 2013 conversation. It instead relied only on Monica's "impression" of Juror 10's beliefs based on the comments she made, as well as the underlying assumption that Juror 10 held onto her bias for approximately eight years.

Moreover, notwithstanding those alleged comments, Juror 10 affirmed during voir dire that she could make an impartial decision based on the evidence at trial. And when she acknowledged during voir dire that she knew Jackson and Monica, Jackson did not question her about any specifics of that relationship or what opinion she held of Jackson. Nor did Jackson elect to peremptorily strike Juror 10 during voir dire. Additionally, Juror 10 testified that while

---

[15] *Compare Nelson*, 41 Va. App. at 732, 734 (holding the trial court had no duty "to conduct a hearing and investigate the potential for [juror] bias" where "[n]othing suggested the juror had a bias . . . such that she would ignore the trial court's instruction to evaluate the evidence and apply the law fairly"), *with Bethea v. Commonwealth*, 68 Va. App. 487, 505, 507 (2018) (finding the trial court did not err in upholding the jury verdict without "investigat[ing] possible juror misconduct" where defendant did not demonstrate "a *probability of prejudice* to the accused"), *aff'd*, 297 Va. 730 (2019).

[16] Although "hearsay affidavits are not admissible in support of a motion for a new trial," "[n]evertheless, such an affidavit may be sufficient to require the trial court to investigate the matters recited in the document." *Com. Union Ins. Co. v. Moorefield*, 231 Va. 260, 265 (1986).

she knew of Jackson, she knew him less than she did Monica, and she did not spend time with either of them. Overall, Juror 10 insisted she had no opinion on the case, despite any pre-existing knowledge she had of Jackson, and affirmed under oath that she could consider the evidence impartially and follow all instructions of the court.

Given those considerations, the trial court reasonably determined that Jackson had not presented "credible allegations of bias that undermine[d] the prior determination of impartiality reached by the court at the conclusion of the *voir dire* process." *Id.* at 733. Accordingly, the trial court did not abuse its discretion in denying Jackson's motion to set aside the verdict, on the grounds of juror bias, without first conducting a hearing on that issue.

## VIII. Denial of Continuance

Finally, Jackson argues that the trial court erred in denying his motion to continue the sentencing hearing. "The decision to grant a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case." *Ortiz v. Commonwealth*, 276 Va. 705, 722 (2008) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)). This Court will reverse the trial court's denial of a continuance "only upon a showing of abuse of discretion *and* resulting prejudice to the movant." *Id.* at 723. "In determining whether the trial court properly exercised its discretionary powers, we look to the diligence exercised by the moving party to gather and make the evidence available." *Smith v. Commonwealth*, 16 Va. App. 630, 636 (1993).

Jackson contends that the trial court erred in "ruling that court authorization was required for the attorney requesting a subpoena to release any subpoenaed witness." However, whether Jackson had the authority to excuse his sentencing witnesses from appearing is immaterial. The trial court denied his request for a continuance after concluding that Jackson excused his

sentencing witnesses at his own peril based on a mere assumption that the court would grant the continuance. That determination was not an abuse of discretion.

Furthermore, Jackson has not shown that he was prejudiced by the lack of a continuance. He filed a motion to set aside the verdict after sentencing and has not shown the impact, if any, that the testimony from the excused character witnesses could have had on the trial court's sentencing decision. As a result, this Court finds no abuse of discretion in the trial court's decision to deny Jackson a continuance of the sentencing proceeding.

CONCLUSION

For the foregoing reasons, this Court affirms Jackson's conviction.

*Affirmed.*